UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLONEL JAMES McGINN<br>    Plaintiff | )<br>)<br>) |
| V. | )<br>) |
| EXECUTIVE OFFICE OF ENERGY AND ENVIRONMENTAL AFFAIRS, MASSACHUSETTS ENVIRONMENTAL POLICE, and SECRETARY MATTHEW A. BEATON in his Official and Individual Capacity<br>    Defendants | )<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

### INTRODUCTION

The Plaintiff, Colonel James McGinn (hereinafter "Plaintiff" or "Col. McGinn"), brings this action seeking redress for substantial violations of his rights pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983, as well as under the Massachusetts Civil Rights Act (M.G.L. ch. 12, §§ 11H, I) and Whistleblower Acts, M.G.L. C. 149, § 185, and related common law claims. These several claims are brought as a result of the Defendants actions in retaliating against the Plaintiff for reporting, objecting to, and filing complaints about what the Plaintiff reasonably believed were ongoing violations of law by members of the Executive Office of Environmental Affairs (hereinafter the "EEA"), the Massachusetts Environmental Police (hereinafter "MEP"), as well as for violations of the Rules and regulations of the Department, Ethical violations, as well as violations of the common law.

### JURISDICTION

The Plaintiff asserts federal jurisdiction under 42 U.S.C. § 1983, and pendent jurisdiction of his state law claims under 28 U.S.C. § 1367.

## PARTIES

1. The Plaintiff, James McGinn, is an individual residing in Lynn, Essex County, the Commonwealth of Massachusetts.

2. Defendant Massachusetts Environmental Police, is an agency created under the laws of the Commonwealth of Massachusetts and the former employer of the Plaintiff.

3. The Defendant, Matthew A. Beaton, was an employee of the Commonwealth of Massachusetts and was at all relevant times, the Plaintiff's direct supervisor within the Executive Office of Energy and Environmental Affairs..

4. The Defendant, Executive Office of Energy and Environmental Affairs, is a State Agency and supervising authority of both Defendant Matthew A. Beaton and the Massachusetts Environmental Police.

## FACTS

### *Colonel James McGinn*

5. Plaintiff, Colonel James McGinn (Hereinafter "Plaintiff" or "Col. McGinn"), was been employed as a Police Officer with the Massachusetts Environmental Police Department ("MEP"), for approximately three years.

6. Plaintiff is, and has always been, an honest, dedicated, energetic and hardworking employee. He is a respected member within the law enforcement community and has been an active participant within his community at large.

7. Throughout his career, Col. McGinn has devoted himself to his law enforcement career, placing the public's safety at the forefront, and executing his responsibilities with honesty and integrity.

### *Colonel McGinn's Whistleblower Activity*

8. Prior to his appointment by Governor Charles Baker, the Plaintiff was a former member of the Massachusetts State Police and not acquainted with the Command staff or the management level members of the Environmental Police.

9. From the beginning of his tenure as the Colonel of the MEP in January of 2015, Colonel McGinn was faced with resistance and isolation by those who had previously held MEP

Command Staff positions, many of whom had been either hired or appointed by the previous administration(s).

10. Defendant Matthew A. Beaton (hereinafter "Secretary Beaton") was at all relevant times, the Secretary for the Executive Office of Energy and Environmental Affairs. Secretary Beaton oversaw the Commonwealth's six environmental, natural resource and energy regulatory agencies, which included the Department of Environmental Protection.

11. During the course of his employment, Colonel McGinn objected to and refused to participate in illegal and/or unethical conduct on the part of Secretary Beaton, and others, within the MEP.

12. Beginning in April of 2015, Secretary Beaton personally contacted Colonel McGinn and requested him to use a law enforcement database to "look into" a new neighbor that had recently moved into Secretary Beaton's neighborhood, stating that Secretary Beaton's wife had concerns about the neighbor's potential criminal past.

13. Secretary Beaton provided Colonel McGinn with the name and address of the individual. Colonel McGinn refused to access the database, and informed Secretary Beaton that he could not go into the Board of Probation or CJIS database without a legitimate law enforcement purpose.

14. It is illegal to access CJIS information system without a legitimate law enforcement purpose.

15. The Plaintiff also frequently objected to Secretary Beaton about what McGinn perceived to be an accepted lack of accountability for many of the senior members of the MEP.

16. Colonel McGinn objected to and refused to participate in this practice of what he believed to be a lack of enforcement by the Defendants of MEP officers' working hours. Despite resistance by the Defendants, Colonel McGinn installed tracking devices on the state owned vehicles of two senior members of the MEP in an effort to monitor their arrival and work preformed while on duty.

17. The Plaintiff repeatedly complained to Secretary Beaton and others within the MEP that there was a complete lack of accountability for many senior MEP employees. The Plaintiff repeatedly stated that changes needed to be made to ensure that MEP employees were actually arriving on time at work and completing their scheduled shifts.

18. The lack of accountability was so significant that Colonel McGinn actually sent out a Department wide email stating the requirement that all employees had to actually come to work on time.

19. On October 16, 2015, Colonel McGinn directed this E-Mail to his Command Staff regarding their accountability and publicly stating their work hours and that the staff were to be at their assigned offices Monday-Friday, from 0900 to1700 hours.

20. Colonel McGinn also required MEP staff to sign in with the dispatch office upon their physical arrival at their duty location to demonstrate their attendance and presence.

21. The MEP has no Internal Affairs division, and as a consequence, due to security and confidentiality concerns within the MEP, the Plaintiff hired an independent investigator to determine whether a senior member of the MEP was actually working his scheduled shifts.[1]

22. Incredibly, the Defendants subsequently used the fact that the Plaintiff hired SRC, an independent investigator to conduct the investigation of this officer, as a basis to terminate Colonel McGinn's employment.

23. The SRC investigation revealed that this officer, on numerous instances, either did not appear for work on time, or at all, on assigned workdays. The substance of this investigation was not made public prior to the Defendants' decision to terminate the Plaintiff in an effort to prevent negative publicity during the 2018 Gubernatorial election.

24. One of the many other objections raised by Colonel McGinn to Defendant Beaton, related to an off-duty MEP Christmas party. Colonel McGinn had been advised that members of the Command Staff in the MEP Westborough Headquarters would be attending a Christmas party at a local bar while operating State issued vehicles.

25. Colonel McGinn directed an investigation of these allegations and determined that one of the Command Staff was observed consuming alcoholic beverages at the bar and was then observed getting into his unmarked MEP truck and driving out of the parking lot after the party.

26. When questioned by investigation officers regarding his consumption of alcohol, the Command Staff officer gave untruthful answers and denied drinking alcohol before driving his state owned vehicle.

27. The Plaintiff recommended that this Command Staff officer be terminated, however the Plaintiff's recommended discipline was overridden by Secretary Beaton, who decided to impose a less severe sanction.

28. These investigations and demands for accountability created tremendous hostility toward Colonel McGinn by many senior members of the MEP, whose work performance had not been scrutinized in the same manner previously.

29. The Plaintiff avers that Defendant Beaton became increasingly hostile toward the Plaintiff for his refusal to run the previously mentioned CJIS check on Beaton's neighbor and

---

[1] The Plaintiff incorporates by reference for all purposes herein, the investigative report conducted by SRC Investigations.

to "assist" Beaton and others politically connected in the fixing of speeding and parking tickets.

30. On or about March 1, 2016, Secretary Beaton called Colonel McGinn and informed him that he had received a speeding ticket for $245 from the Framingham Police Department. Beaton asked what Colonel McGinn could do to assist with the ticket.

31. Secretary Beaton then sent Colonel McGinn a copy of the citation. Colonel Beaton appropriately advised Defendant Beaton to submit the citation for a hearing and let a Clerk Magistrate rule on it. (See Attached as Exhibit A.)

32. On or about March 30, 2016, Secretary Beaton subsequently sent McGinn a photograph of the Hearing Notice Beaton had received to appear for the hearing on his $245 speeding ticket and again asked what McGinn could do to assist with the ticket.

33. Once again, Colonel McGinn appropriately advised the Defendant that there was nothing he could do regarding the ticket and to submit the citation and request a hearing before a Clerk Magistrate.

34. The Plaintiff avers that Secretary Beaton was upset that Colonel McGinn would not "assist" him with the speeding ticket.

35. Shortly after the Plaintiff's refusal to intervene with Beaton's speeding ticket, Beaton instructed McGinn and other MEP employees not to send any future emails containing confidential or personal information that could be the subject of a future Freedom of Information (FOIA) request. Defendant Beaton stated to Colonel McGinn that it would be a better practice in the future to call on an office phone or private cellphone.

36. Secretary Beaton was also aware that during the 2014 Gubernatorial Campaign, the same question regarding two (2) speeding tickets was asked of Colonel McGinn by Lt. Governor Karyn Polito's campaign driver, who had been stopped for speeding by the State Police and Framingham Police while operating Ms. Polito's personal car.

37. Colonel McGinn would not intervene to "assist" with either of these speeding tickets and appropriately advised her to submit the citation for a hearing and let a Clerk Magistrate rule on them.

38. In a similar fashion, a member of the Defendant EEA's executive staff, the Director of Facilities and Infrastructure, had previously contacted Colonel McGinn on October 27, 2017, regarding a Boston Parking Ticket: # 48562737-6 issued by Boston Parking enforcement on Medford Street to one of the Director's staff.

39. The Director of Facilities and Infrastructure had requested that this ticket be voided, however, Colonel McGinn did not intercede, rather he advised her to go through the proper channels at Boston City Hall.

5

40. Colonel McGinn also objected to Secretary Beaton regarding the MEP's practice that required Environmental police officers to teach classes at a private day camp, the Junior Conservation Camp, without reimbursing the Commonwealth in both the summers of 2016 and 2017. He was overruled on both occasions.

41. Colonel McGinn also questioned the source of this money and expressed his concerns that MEP officers were being paid out of Federal Boating Safety grant money for their time teaching at this class.

42. The Gun Owner's Action League ("G.O.A.L.") and the Worcester County Sportsmen League had, since 2009, run this summer camp that charged $900 per student to attend. At least two MEP officers a day had been routinely ordered to teach these classes without ever reimbursing the Commonwealth for the cost of this assignment.

43. McGinn was also advised by MEP Financial Director Robert Wong that for at least 8 years, the MEP had never been reimbursed for payroll and cruiser costs by this private camp organization.

44. The Plaintiff specifically objected to this practice and told Secretary Beaton that it was against Departmental Rules, at a minimum unethical, and that the camp was a drain on Departmental manpower during peak boating season.

45. Colonel McGinn also informed Secretary Beaton that EPO's were being paid to do MEP related work at this camp and that they should not be using state cruisers nor be forced to teach at a private "for profit" event without being reimbursed for the salaries of the EPO's involved.

46. The Plaintiff refused to participate in what he reasonably believed was an unethical, if not illegal practice.

47. As a consequence, Colonel McGinn emailed Marion Larson, an employee of Massachusetts Fish and Wildlife Division, who was a coordinator helping "G.O.A.L." set up the schedule for these classes. The Plaintiff informed Ms. Larson that EPO's would no longer be teaching the classes at this camp without reimbursement to the Commonwealth.

48. Soon after Colonel McGinn's email was sent to Ms. Larson, Secretary Beaton personally called the Plaintiff and ordered him to assign MEP officers to teach at this camp. Beaton then instructed the Plaintiff to "cooperate" with Fish and Wildlife in the future. No reimbursement to the Commonwealth was ever made.

49. On December 11, 2017, Colonel McGinn contacted the Environmental Affairs Agency's Legal Department regarding an Environmental Police Officer that has been out on (IOD Leave) injured on duty leave since the spring of 2015 with no follow up from the Agency's Human Resource Department on when the officer will return.

50. The Plaintiff stressed to the Legal Department that this was an inordinately long period of time for an officer to be out on paid leave and that the officer must be given the option to either come back to work or be retired with a disability pension.

51. Colonel McGinn explained that this employee was a waste of payroll and potential fraud due to a lack of follow up by the EEA Human Resource (HR) Department, and that he had been pushing for months with HR to get an (IME) independent medical examination of this officer.

52. The Defendant's Legal Department staff advised Colonel McGinn they didn't know the process for retiring an individual on a medical disability. The Plaintiff advised them that the Massachusetts State Police follow this procedure when an officer is injured on duty. Colonel McGinn was then advised to contact the Massachusetts State Police and get their policy and medical contacts on the issue of injured on duty disability.

53. Colonel McGinn then contacted the Massachusetts State Police medical affairs unit as requested and passed the information to the Defendants' HR and Legal Departments.

54. Colonel McGinn was advised to have MEP Financial Director Robert Wong locate doctors under state contract that this Sergeant could be sent for an evaluation and to get the process moving forward. Wong did this and provided HR and Legal with the doctors information. To this date, the Sergeant in question continues to collect full injured on duty pay.

55. The Plaintiff's objections about the delay in processing this officer's injured on duty claim were not well received by either Secretary Beaton or the Legal Department[2] who viewed them as an unwarranted criticism of their handling of the injured on duty matter.

56. On May 8, 2018, Colonel McGinn attended the EEA monthly Commissioner's meeting. During this meeting, it was emphasized that due to the upcoming gubernatorial élection there was a need to project a positive image of the current administration.

57. Secretary Beaton instructed those in attendance that no one should raise any major problems or issues that would "look bad" for the Governor with the gubernatorial election occurring in six months.

58. In August of 2018, Colonel McGinn notified Secretary Beaton and others that an Environmental Police supervising officer was not currently in his assigned area and hadn't been there for at least three hours. The MEP supervisor should have been in the metropolitan Boston area, instead he was still in his hometown of Shrewsbury.

---

[2] Members of the Defendant EEA Legal Department would subsequently conduct the "investigation" of Colonel McGinn.

59. The Plaintiff also stated his belief that all of the MEP officers needed to be more closely monitored and there was an urgent need for the Agency to expedite the GPS device installation Colonel McGinn was attempting to implement.

60. Colonel McGinn had also complained about this issue with EEA Labor Attorney, Thomas Costello, and stated his belief that the lack of accountability for members of the Department was a problem region wide and that there was a need to expedite surveillance and monitoring measures.

61. Colonel McGinn also advised Attorney Costello that he was receiving reports from other EEA members that certain command staff were not showing up in Westborough Headquarters and that the Plaintiff intended to closely monitor the situation.

62. Specifically, Finance Director Robert Wong and Grant Specialist John Reardon had told Colonel McGinn that they routinely traveled to Westborough headquarters for various meetings with contractors.

63. On May 8, 2018, Mr. Wong and Mr. Reardon advised Colonel McGinn that they rarely saw the two command staff members assigned to this office at that location during their working hours.

64. Colonel McGinn was embarrassed by these reports and informed both Mr. Wong and Mr. Reardon that he would take the necessary steps to correct the matter.

65. After speaking with Mr. Wong and Mr. Reardon, Colonel McGinn advised Secretary Beaton that he had received several reports that certain command staff members were not showing up for work in Westborough and that he was going to monitor their activity.

66. Secretary Beaton advised Colonel McGinn to keep a "lid on things" because no one wanted to hear of any problems before the upcoming Gubernatorial election.

67. Once again, on September 11, 2018, Colonel McGinn attended the EEA monthly Commissioner's meeting where Secretary Beaton instructed those in attendance that no one should be raising any major problems that would look bad for the Governor and generate bad publicity.

68. Colonel McGinn contacted OLE Finance Director Robert Wong to request the installation of cameras. The cameras in Westborough were also for the surveillance and safety of the MEP cruiser fleet parked there in an isolated setting. Security was also necessary for a bunker in this complex that houses MEP guns, rifles, confiscated weapons and confiscated drugs.

69. Significantly, there was no alarm on this bunker, just a push button coded lock. McGinn had requested through the EEA building and Maintenance director an alarm for this building or at least a keycard system. He was advised that the keycard system would have

to wait, since the Secretaries office wanted to do keycards for EEA properties all at once to reduce the cost.

70. As a result of these concerns, Colonel McGinn ordered the installation of surveillance cameras at the Westborough office to ensure work attendance by all Department members, as well as security for the facility itself.

71. As the Departmental head of the Environmental Police, Colonel McGinn had the managerial authority, indeed the responsibility, to investigate these employment issues and to take the appropriate steps to ensure that public funds were being properly spent for work actually performed. He also had the responsibility to maintain the security of a law enforcement facility under his control.

### *Retaliation Against Colonel McGinn*

72. During the latter time period of Colonel McGinn's supervision of the MEP, the Boston media had, for a period of the previous 10 months, focused on issues surrounding overtime abuse by members of law enforcement, in particular, E-Troop of the Massachusetts State Police. The media was also critical of the current administration's handling of these overtime abuse issues.

73. Both Federal and State criminal investigations were conducted regarding the abuse of State Police overtime. In light of these investigations, Colonel McGinn's efforts to demand accountability and to professionalize the MEP should have been applauded.

74. Instead, Colonel McGinn himself became the subject of an "investigation" and was terminated by the Defendants on October 19, 2018, for unfounded allegations that he had allegedly "fixed (2) tickets" on a civil motor vehicle infraction that had occurred three years earlier in 2015.

75. The 2015 allegations of "misconduct" made against the Plaintiff centered around two civil citations issued to two "neighbors"[3] of Colonel McGinn in 2015 by an MEP officer. The parents were cited by an MEP officer for allowing their juvenile children, aged 14 and 15, to operate an unregistered "dirt bike."

76. The citations issued in 2015 were subsequently voided by Major William Billotta of the MEP. Major Billotta informed the Defendants that this was a routine occurrence within the department for minor juvenile violations and consistent with what had occurred in other similar situations involving juvenile offenders.

---

[3] The "neighbors" live in the vicinity of Colonel McGinn's ex-wife in Bedford, Massachusetts. Colonel McGinn lives in Lynn and hasn't resided in the Town of Bedford since 2011.

9

77. Colonel McGinn has continuously and adamantly denied playing any role in the voiding of these two citations.

78. Major William Billotta, a respected member of the MEP, confirmed that Colonel McGinn had never attempted to intercede on these citations. No interviews were ever conducted by the Defendants of the "neighbors" that the citations were issued to.

79. Despite the Plaintiff's (and Major Billotta's) denials, the Plaintiff was never provided with any formal notice of the specifics regarding these allegations. There was never a hearing conducted by the Defendants on their claim of misconduct. No witnesses were ever called before a neutral fact finder to support their allegations. No investigative materials or interviews of any parties were ever provided to the Plaintiff in advance of his termination.

80. The Plaintiff avers that the very members of the Department who were the subject of the investigation(s) initiated by Colonel McGinn, in conjunction with others, resurrected the three-year-old voided citations during a political election year in an effort to thwart McGinn's efforts to reform the MEP and hold them accountable.

81. No effort was made by the MEP investigators to determine if other civil citations issued to juveniles under similar circumstances had been voided in the past in the same manner.

82. To support their decision to terminate the Plaintiff, the Defendants relied upon information gathered over the telephone and reported in the Boston Globe.

83. Defendant Beaton was well aware that Colonel McGinn was not predisposed to fix tickets for anyone based upon Defendant Beaton's own request for the Plaintiff to do so.

84. Had the MEP actually done a thorough investigation, they would have verified Colonel's consistent response in nearly identical instances where Colonel McGinn did nothing to intercede on behalf of any of the above identified individuals for their speeding or parking tickets.

85. Secretary Beaton withheld all of this pertinent information from the Defendants' investigators conducting their investigation of the 2015 civil citations issued to McGinn's neighbors and chose not to defend McGinn's actions to professionalize the MEP.

86. Without anything more than speculation, and despite the unequivocal denial from Major Billotta that Colonel McGinn had no involvement in voiding the 2015 civil citations, the Defendants purportedly "found a reasonable basis to conclude that Colonel McGinn influenced the disposition of the citations in a manner that benefited a personal acquaintance."

87. The so-called "investigation" of these allegations was shoddy, politically motivated and done in a retaliatory effort to silence and remove Colonel McGinn from his position during a critical period of the Gubernatorial campaign.

88. Given the pending election, Secretary Beaton suggested that Colonel McGinn should "quietly resign" prior to any investigation ever having been conducted. Beaton also stated that if you don't resign, "they'll go to the press and things will get ugly." The Plaintiff refused to resign and denied doing anything improper.

89. When the Plaintiff refused to resign from his position, the Plaintiff was informed by the Defendants that he would be criminally prosecuted for allegedly voiding the 2015 civil citations.

90. When the Plaintiff again refused to resign, the Defendants forwarded their "investigation" of the matter to the Attorney General's office, who took no action against the Plaintiff. The Defendants then "leaked" information to the media about their investigation of the Plaintiff in an effort to embarrass and humiliate the Plaintiff and coerce his resignation from the MEP.

91. One of the other allegations made by the Defendants in an effort to justify Colonel McGinn's termination was related to his "unilateral" decision to install surveillance security cameras at the Westborough MEP headquarters.

92. This allegation was made by the Defendants despite the fact that both Wong and Reardon had openly complained to the Plaintiff that two senior officers were not showing up for work at their assignment in Westborough.

93. Colonel McGinn subsequently notified MEP Grants Director Reardon about the need for surveillance cameras so he could attempt to purchase them through a grant. Reardon did find the cameras and ordered them. The Defendants' "investigation" of this matter also confirmed that Colonel McGinn had previously notified Finance Director Wong about his intention to purchase surveillance cameras.

94. The Plaintiff further avers that the same type of surveillance cameras had previously been installed at the Gloucester, Charlestown, and Hingham MEP stations, without issue by the Defendants EEA or the MEP.

95. The Defendants investigative report clearly states that the Plaintiff met with another high-ranking member of the Department on August 29, 2018, and openly stated his intention to install the cameras "to conduct surveillance based on suspicions that employees were improperly reporting work hours."

96. Colonel McGinn was wrongfully terminated from his employment on October 19, 2018, less than three weeks prior to the 2018 Gubernatorial election.

97. On January 2, 2019, Colonel McGinn, via counsel, sent Secretary Beaton and the Defendants EAA, and MEP notice of his Massachusetts Whistleblower claim pursuant to M.G.L.C. 149 sec. 185.[4]

98. Neither Defendants, EAA, MEP, or Defendant Beaton ever responded to this Whistleblower correspondence or offered any rebuttal to the Plaintiff's claims of retaliation.

99. Instead the Defendants attempted to silence the Plaintiff by threatening him with referring the matter to the State Ethics Commission for investigation.

100. For a period in excess of five months, between January of 2019, and May 16, 2019, the State Ethics Commission took no action against the Plaintiff

101. In late April, 2019, Colonel McGinn, via counsel, sent Attorney Tori Kim, General Counsel for the EEA, a second notice of his Massachusetts Whistleblower claim pursuant to M.G.L.C. 149 sec. 185, and stated the Plaintiff's intention to file suit against the Defendants for retaliation.[5]

102. On or about the same time period, the Boston Globe and Channel Five positively reported the content of the Plaintiff's Whistleblower letter.

103. On April 29, 2019, Secretary Beaton resigned from his position as Secretary of the Defendant EEA.

104. Shortly after the Plaintiff sent the 2nd Whistleblower letter and informed the Defendants of his intention to sue, the State Ethics Commission, on May 16, 2019, notified the Plaintiff that they had voted to investigate the allegations of the 2015 civil citations issued to his "neighbors."

COUNT ONE- VIOLATION OF CIVIL RIGHTS 42 U.S.C., §1983
V.
EEA, MEP and Secretary Matthew Beaton

105. The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

106. Defendants EEA, MEP, and Matthew A. Beaton, individually and collectively, while acting under color of law, attempted to interfere with, and did interfere with the Plaintiffs' exercise and enjoyment of rights secured by the Constitution and laws of the United States and the Massachusetts Declaration of Rights, including his right to free

---

[4] The Plaintiff incorporates, for all purposes, the content of that Whistle Blower claim notification correspondence in this complaint.

[5] The Plaintiff incorporates, for all purposes, the content of that 2nd correspondence in this complaint.

speech, right to continued employment, right to participate in concerted activity, right to Due Process and the right to petition and seek redress from Governmental abuse.

107. As a consequence of the above identified Defendants' actions, the Plaintiff has suffered and continues to suffer, economic loss, fear and emotional distress, loss of status in his community, loss of reputation and promotional opportunities.

108. The Plaintiff seeks compensatory as well as punitive damages against the Defendants in both their official and individual capacities for their actions, as well as reasonable attorney's fees and such other relief as the court deems appropriate.

COUNT TWO - WHISTLEBLOWER (M.G.L. ch. 149, § 185)
v. EXECUTIVE OFFICE OF ENVIRONMENTAL AND ENEGY AFFAIRS (EEA), and MASSCHUSETTS ENVIRONMENTAL POLICE (MEP)

109. The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

110. Plaintiff, through various means and measures, reported, objected to, filed written complaints and reports about what he reasonably believed were ongoing violations of law, and/or Departmental rules and regulations, as well as ethics violations within both the EEA and the MEP, as fully stated above.

111. The Defendants, individually and collectively, retaliated against the Plaintiff for disclosing, objecting to and/or refusing to participate in an activity, policy or practice which the Plaintiff reasonably believed was in violation of a law and/or a rule or regulation promulgated by law, in violation of the Massachusetts Whistleblower statute, G.L.c.149 §185.

112. Plaintiff has been retaliated against for reporting and objecting to and/or refusing to participate in the Defendants' illegal and/or unethical actions and as a result of raising these issues the Plaintiff was subsequently subjected to retaliation, disparate treatment, a hostile work environment, retaliatory acts affecting his employment, and ultimately termination resulting in the loss of his income and other benefits he would have otherwise received from his employment.

113. As a consequence of the Defendants' individual and collective actions as stated above, Plaintiff suffered and continues to suffer damages, including, but not limited to: loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional and mental distress.

WHEREFORE, Plaintiff demand judgment against the Defendants on Count II, plus interest and costs of this action, treble damages and reasonable attorneys' fees as provided under G.L.c.149, Section 185.

## COUNT THREE – MASSACHUSETTS CIVIL RIGHTS (M.G.L. ch. 12, §§ 11H, I)
### v. Defendants, EEA, MEP, and Matthew Beaton

114. The Plaintiff incorporates herein the previous allegations set forth in this Complaint.

115. Defendants EEA, MEP and Matthew A. Beaton, in his official and individual capacities, attempted to interfere with, and did interfere with Plaintiff's exercise and enjoyment of rights secured by the Constitution and laws of the United States, and the Constitution and laws of the Commonwealth of Massachusetts, by threats of criminal prosecution, intimidation and coercion, including economic coercion, his right to free speech, his right to continued employment, his right to seek redress in the litigation of his claims and Due Process of law.

WHEREFORE, Plaintiff demand judgment against the Defendants on Count III, plus interest and costs of this action, and reasonable attorneys' fees as provided under M.G.L. c. 12, Section 11I.

## COUNT FOUR
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY UNDER MASSACHUSETTS LAW (TORT) (Against all Defendants)

116. Colonel McGinn hereby restates and incorporates by reference all of the previous allegations made in the above stated paragraphs in this complaint.

117. Defendants, by their conduct, unlawfully retaliated against Plaintiff for disclosing, objecting to and/or refusing to participate in an activity, policy or practice which he reasonably believed were in violation of Massachusetts regulations and laws.

118. Defendants' unlawful retaliation ultimately resulted in the termination of his employment.

119. Defendants' conduct as set forth above is the result of intentional retaliation and its functional equivalent and constitutes Wrongful Termination in Violation of Public Policy under Massachusetts law.

120. Defendants' conduct as set forth above adversely affected the terms, conditions and privileges of McGinn's employment. As a result of Defendants' unlawful retaliation, McGinn has suffered and continues to suffer economic damages and emotional distress damages, for which Defendants are liable.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.
WHEREFORE, the Plaintiff, Colonel James McGinn, respectfully requests that this Court:

1. Enter judgment in his favor on each Count of this Complaint;

2. Reinstate the Plaintiff to the employment position which he previously held with the Defendant Agency;

3. Award the Plaintiff compensatory damages, including, but not limited to, loss of pay and emotional distress damages;

4. Award the Plaintiff his costs and attorneys' fees;

5. Award the Plaintiff multiple and/or punitive damages; and

6. Award the Plaintiff such other relief as this Court deems just, equitable and appropriate.

Respectfully submitted,
For Colonel James McGinn
By his attorney,

LAW OFFICES OF TIMOTHY M. BURKE

/s/ Timothy M. Burke, Esq.
Timothy M. Burke BBO # 065720
160 Gould Street, Suite 100
Needham, MA 02494-2300
(781) 455-0707

Certificate of Service

I hereby certify that these documents were filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be mailed via first class mail to those registered as non-participants.

Dated: 07/16/2019            /s/ Timothy M. Burke