UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COLONEL JAMES McGINN | ) |
|     Plaintiff | ) |
| | ) |
| V. | ) |
| | ) |
| EXECUTIVE OFFICE OF ENERGY AND | ) C.A. No.: 1:19-cv-11551-IT |
| ENVIRONMENTAL AFFAIRS, | ) |
| MASSACHUSETTS ENVIRONMENTAL | ) |
| POLICE, and SECRETARY MATTHEW | ) |
| A. BEATON in his Official and Individual Capacity | ) |
|     Defendants | ) |

## PLAINTIFF JAMES MCGINN'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The Plaintiff, James McGinn, (hereinafter "Plaintiff") submits this Memorandum in

Opposition to Executive Office of Energy and Environmental Affairs ("EEA"), the

Massachusetts Environmental Police ("MEP"), and former EEA Secretary Matthew Beaton sued

in his official capacity ("Secretary") (collectively, the "State Defendants") Motion to Dismiss.

As explained below, the facts and allegations laid out in Plaintiff's Complaint sufficiently plead

all elements of the claims presented and are not appropriate for a dismissal pursuant to

Fed.R.Civ.P. 12(b)(6). The Defendant's Motion should therefore be denied and this case should

proceed forward.

## INTRODUCTION

This is a case alleging that the Plaintiff, Colonel James McGinn, who was employed as

the head of the Massachusetts Environmental Police Department ("MEP") for approximately

three years, suffered retaliatory acts as a result of whistleblowing activities and the exercise of

his First Amendment rights.

As clearly alleged in the Plaintiff's Complaint ("Complaint"), in defiance of repeated direct orders from his supervisor, former EEA Secretary Matthew Beaton ("Defendant Beaton"), to "keep a lid on things" Plaintiff spoke out (both within and outside of the MEP) regarding the threat to public safety that was created by multiple MEP officers not performing their duties, fraudulent activity, as well as their potentially criminal conduct. In retaliation, and consistent with a custom of chilling free speech, the MEP terminated McGinn. Now, despite detailed factual allegations in the Complaint describing the disturbing practice, Defendants seek the dismissal of McGinn's civil rights claims.

Under these circumstances, if the Court were to grant the Defendants' motion it would deprive McGinn of his First Amendment right to speak as a citizen on a matter of public concern and would undermine the public's interest in having public employees send up a flare regarding improper or illegal government acts. McGinn submits that the Court should not do so. In tacit recognition that their Motion would fail if they confronted the allegations of the Complaint head-on (as they are required to do), Defendants impermissibly disregard or grossly mischaracterize the Complaint to manufacture an argument that McGinn has been stripped of his First Amendment rights because he supposedly engaged in nothing but "complaints and disagreements…about management practices" Memorandum of Law in Support of Motion ("Mem"), at 9. The predicate basis upon which Defendants filed their motion is false, and the Motion should be denied.

STATEMENT OF FACTS

Plaintiff respectfully refers the Court to his Complaint, wherein Plaintiff provides a detailed recitation of factual allegations establishing each of his causes of action. The following specific facts taken from Plaintiff's Complaint address the arguments asserted by Defendants in

their Motion to Dismiss.

Plaintiff, Colonel James McGinn (Hereinafter "Plaintiff" or "Colonel McGinn"), has been employed as a Police Officer with the Massachusetts Environmental Police Department ("MEP"), for approximately three years. Compl. ¶ 4. Plaintiff is, and has always been, an honest, dedicated, energetic and hardworking employee. He is a respected member within the law enforcement community and has been an active participant within his community at large. Id. ¶ 6.

Defendant Matthew A. Beaton (hereinafter "Secretary Beaton") was at all relevant times, the Secretary for the Executive Office of Energy and Environmental Affairs. Secretary Beaton oversaw the Commonwealth's six environmental, natural resource and energy regulatory agencies, which included the Department of Environmental Protection. Id. ¶ 10.

During the course of his employment, Colonel McGinn objected to and refused to participate in illegal and/or unethical conduct on the part of Secretary Beaton, and others, within the MEP. Id. ¶11.

Beginning in April of 2015, Secretary Beaton personally contacted Colonel McGinn and requested him to utilize CJIS, a law enforcement database, to "look into" a new neighbor that had recently moved into Secretary Beaton's neighborhood, stating that Secretary Beaton's wife had concerns about the neighbor's potential criminal past. Secretary Beaton provided Colonel McGinn with the name and address of the individual. Colonel McGinn refused to access the database, and informed Secretary Beaton that he could not go into the Board of Probation or CJIS database without a legitimate law enforcement purpose. Id. ¶¶ 12-13.

Colonel McGinn also frequently objected to and refused to participate in the practice of what he believed to be a lack of enforcement by the Defendants of MEP officers' working hours.

The Plaintiff repeatedly objected to and stated to Secretary Beaton and others within the MEP that there was a complete lack of accountability for many senior MEP employees. The Plaintiff believed that certain employees were in effect, stealing time from work, by getting paid for work that was not performed. The Plaintiff repeatedly stated that changes needed to be made to ensure that MEP employees were actually arriving on time at work and completing their scheduled shifts. The lack of accountability was so significant that Colonel McGinn actually sent out a Department wide email stating the requirement that all employees had to actually come to work on time and complete their scheduled shifts. Id. ¶¶ 16-18.

Due to security and confidentiality concerns within the MEP, the Plaintiff hired SRC, an independent investigator, to determine whether a senior member of the MEP was actually working his scheduled shifts. Id. ¶21. The SRC investigation revealed that this officer, on numerous instances, either did not appear for work on time, or at all, for his assigned workdays. Id. ¶22.

On or about March 1, 2016, Secretary Beaton called Colonel McGinn and informed him that he had received a speeding ticket for $245 from the Framingham Police Department. Beaton asked what Colonel McGinn could do to "assist with the ticket." Beaton then sent Colonel McGinn a copy of the citation. Colonel Beaton appropriately advised Defendant Beaton to submit the citation for a hearing and let a Clerk Magistrate rule on it. Id. ¶30.

On or about March 30, 2016, Secretary Beaton subsequently sent McGinn a photograph of the Hearing Notice to appear for the hearing on his $245 speeding ticket and again asked what McGinn could do "to assist" with the ticket. Once again, Colonel McGinn appropriately advised the Defendant that there was nothing he could do regarding the ticket and to submit the citation and request a hearing before a Clerk Magistrate. Id. ¶31.

Shortly after the Plaintiff's refusal to intervene with Beaton's speeding ticket, Beaton instructed McGinn and other MEP employees not to send any future emails containing confidential or personal information that could be the subject of a future Freedom of Information (FOIA) request. Defendant Beaton stated to Colonel McGinn that it would be a better practice in the future to call on an office phone or private cellphone. Id. ¶33.

Secretary Beaton was also aware that during the 2014 Gubernatorial Campaign, the same question regarding two (2) speeding tickets was asked of Colonel McGinn by Lt. Governor Karyn Polito's campaign driver, who had been stopped for speeding by the State Police and Framingham Police while operating Ms. Polito's personal car. Colonel McGinn would not intervene to "assist" with either of these speeding tickets and appropriately advised her to submit the citation for a hearing and let a Clerk Magistrate rule on them. Id. ¶¶ 34-35.

Colonel McGinn also objected to Secretary Beaton regarding the MEP's practice that required Environmental Police Officers to teach classes at a private day camp, Junior Conservation Camp, without reimbursing the Commonwealth in both the summers of 2016 and 2017. Mcginn was overruled on both occasions. McGinn questioned the source of this money and expressed his concerns that MEP officers were being paid out of Federal Boating Safety grant money for their time teaching at this class. Id. ¶ 38.

The Gun Owner's Action League ("G.O.A.L.") and the Worcester County Sportsmen League had run this summer camp that charged $900 per student to attend since 2009. At least two MEP officers a day had been routinely ordered by the Defendants to teach these classes without ever reimbursing the Commonwealth for the cost of the officer's assignment. Id. ¶ 39.

The Plaintiff specifically objected to this practice and told Secretary Beaton that it was against Departmental Rules, at a minimum unethical, and that the camp was a drain on

Departmental manpower during peak boating season. Colonel McGinn also informed Secretary Beaton that EPO's were being paid to do MEP related work at this camp and that they should not be using state cruisers nor be forced to teach at a private "for profit" event without being reimbursed for the salaries of the EPO's involved. Id. ¶¶ 41-42.

As a consequence, Colonel McGinn emailed Marion Larson, an employee of Massachusetts Fish and Wildlife Division, who was a coordinator helping "G.O.A.L." set up the schedule for these classes. The Plaintiff informed Ms. Larson that EPO's would no longer be teaching the classes at this camp without reimbursement to the Commonwealth. Soon after Colonel McGinn's email was sent to Ms. Larson, Secretary Beaton personally called the Plaintiff and ordered him to assign MEP officers to teach at this camp. Beaton then instructed the Plaintiff to "cooperate" with Fish and Wildlife in the future. No reimbursement to the Commonwealth was ever made. Id. ¶¶ 44-45. It is clear by his actions and statements that Colonel McGinn objected to, and refused to participate in, what he reasonably believed were illegal actions by the Defendants.

On May 8, 2018, Colonel McGinn attended the EEA monthly Commissioner's meeting. During this meeting, it was emphasized that due to the upcoming gubernatorial election there was a need to project a positive image of the administration. Secretary Beaton instructed those in attendance that no one should raise any major problems or issues that would "look bad" for the Governor in light of the gubernatorial race occurring in six months. Id. ¶¶ 53-54.

In August of 2018, Colonel McGinn notified Secretary Beaton and others that an Environmental Police supervising officer was not currently in his assigned area and hadn't been there for at least three hours. Id. ¶¶ 55-56. Colonel McGinn had also complained about this issue with EEA Labor Attorney, Thomas Costello, and stated his beliefs that the lack of accountability

for members of the Department was a problem region wide and that there was a need to expedite surveillance measures. Id. ¶57.

Colonel McGinn also advised Attorney Costello that he was receiving reports from other EEA members that certain command staff were not showing up in Westborough Headquarters and that he (Plaintiff) intended to closely monitor the situation. Id. ¶58.

Specifically, Finance Director Robert Wong and Grant Specialist John Reardon had told Colonel McGinn that they routinely traveled to Westborough headquarters for various meetings with contractors. On May 8, 2018, Mr. Wong and Mr. Reardon advised Colonel McGinn that they rarely saw the two command staff members assigned to this office at that location during their working hours. Colonel McGinn was embarrassed by these reports and informed both Mr. Wong and Mr. Reardon that he would take the necessary steps to correct the matter. Id. ¶¶ 59-60.

After speaking with Mr. Wong and Mr. Reardon, Colonel McGinn advised Secretary Beaton that he had received several reports that certain command staff members were not showing up for work in Westborough and that he was going to monitor their activity. Secretary Beaton advised Colonel McGinn to "keep a lid on things" because no one wanted to hear of any problems before the upcoming Gubernatorial election. Id. ¶¶ 61-62.

Once again, on September 11, 2018, Colonel McGinn attended the EEA monthly Commissioner's meeting where Secretary Beaton instructed those in attendance that no one should be raising any major problems that would look bad for the Governor and generate bad publicity. Id. ¶ 63.

McGinn contacted OLE Finance Director Robert Wong to request the installation of cameras in Westborough. The cameras were for the surveillance and safety of the MEP cruiser fleet parked there in an isolated setting. Security was also necessary for a bunker in this complex

that houses MEP guns, rifles, confiscated weapons and confiscated drugs. Id. ¶¶ 64-65.

Due to these safety concerns and concerns for the security of the facility itself, and as a means to ensure work attendance by all Department members, Colonel McGinn ordered the installation of surveillance cameras at the Westborough office. As the Departmental Head of the Environmental Police, Colonel McGinn had the managerial authority, indeed the responsibility, to investigate these employment issues and to take the appropriate steps to ensure that public funds were being properly spent for work actually performed. He also had the responsibility to maintain the security of a law enforcement facility under his control. Id. ¶¶ 66-67.

*Retaliation Against Colonel McGinn*

During the latter time period of Colonel McGinn's supervision of the MEP, the Boston media had, for a period of the previous ten (10) months, focused on issues surrounding overtime abuse by members of law enforcement – E-Troop of the Massachusetts State Police in particular. The media was also critical of the current administration's handling of these overtime abuse issues. Both Federal and State criminal investigations were conducted regarding the abuse of State Police overtime because, in effect, officers were being paid for work that was not performed. In light of these investigations, Colonel McGinn's efforts to demand accountability and to professionalize the MEP should have been applauded. Id. ¶¶ 68-69.

Instead, Colonel McGinn himself became the subject of an "investigation" conducted by the Defendants. He was subsequently terminated by the Defendants on October 19, 2018, for unfounded allegations that he had allegedly "fixed (2) tickets" on a civil motor vehicle infraction that had occurred three years earlier in 2015. Id. ¶70.

The 2015 allegations of "misconduct" made against the Plaintiff centered around two

civil citations issued by an MEP officer and given to two "neighbors"[1] of Colonel McGinn in 2015. The parents were cited by an MEP officer for allowing their juvenile children, aged 14 and 15, to operate an unregistered "dirt bike." Id. ¶71.

The citations issued in 2015 were subsequently voided by Major William Billotta of the MEP. Major Billotta informed the Defendants that this was a routine occurrence within the department for minor juvenile violations and consistent with what had occurred in other similar situations involving juvenile offenders. Colonel McGinn has continuously and adamantly denied playing any role in the voiding of these two citations. Major William Billotta confirmed that Colonel McGinn had never attempted to intercede on behalf of his neighbors. Id. ¶¶ 72-74.

Despite the Plaintiff's and Major Billotta's denials, the Plaintiff was never provided with any formal notice of the specifics regarding these allegations. There was never a hearing conducted by the Defendants on their claim of misconduct. No witnesses were ever called before a neutral fact finder to support their allegations. No investigative materials or interviews of any parties were ever provided to the Plaintiff in advance of his termination. Id. ¶75. No effort was made by the MEP investigators to determine if other civil citations issued to juveniles under similar circumstances had been voided in the past in the same manner. To support their decision to terminate the Plaintiff, the Defendants relied upon information gathered over the telephone and reported in the Boston Globe. Id. ¶¶ 77-78.

Without anything more than speculation, and despite the unequivocal denial from Major Billotta that Colonel McGinn had no involvement in voiding the 2015 civil citations, the Defendants purportedly "found a reasonable basis to conclude that Colonel McGinn influenced

---

[1] The "neighbors" live in the vicinity of Colonel McGinn's ex-wife in Bedford, Massachusetts. Colonel McGinn lives in Lynn and hasn't resided in the Town of Bedford since 2011.

the disposition of the citations in a manner that benefited a personal acquaintance." Id. ¶82.

Given the pending election, Secretary Beaton had suggested that Colonel McGinn should "quietly resign" prior to any investigation being conducted. Beaton also stated that if McGinn didn't resign, "they'll go to the press and things will get ugly." The Plaintiff refused to resign. When the Plaintiff refused to resign from his position, the Plaintiff was informed by the Defendants that he would be criminally prosecuted for the voiding of the 2015 civil citations. Id. ¶¶ 84-85.

One of the other allegations made by the Defendants in an effort to justify Colonel McGinn's termination was related to his "unilateral" decision to install surveillance security cameras at the Westborough MEP headquarters. This allegation was made by the Defendants despite the fact that both Mr. Wong and Reardon had openly complained to the Plaintiff that two senior officers were not showing up for work at their assignment in Westborough. Id. ¶¶ 87-88.

Colonel McGinn subsequently notified MEP Grants Director Reardon about the need for surveillance cameras so he could attempt to purchase them through a grant. Reardon found the cameras necessary and ordered them. The Defendants' "investigation" of this matter also confirmed that Colonel McGinn had previously notified Finance Director Wong about his intention to purchase surveillance cameras. Id. ¶89.

The Plaintiff further avers that the same type of surveillance cameras had previously been installed at the Gloucester, Charlestown, and Hingham MEP stations, without issue by the Defendants EEA or the MEP. Id. ¶90. The Defendants investigative report clearly states that the Plaintiff met with another high-ranking member of the Department on August 29, 2018, and openly stated his intention to install the cameras "to conduct surveillance based on suspicions that employees were improperly reporting work hours." Id. ¶91.

Colonel McGinn was terminated from his employment on October 19, 2018, less than three weeks prior to the 2018 Gubernatorial election. Id. ¶92.

On January 2, 2019, Colonel McGinn, via counsel, sent Secretary Beaton and the Defendants EAA, and MEP notice of his Massachusetts Whistleblower claim pursuant to M.G.L.C. 149 sec. 185. In response, the Defendants attempted to silence the Plaintiff by threatening him with referring the matter to the State Ethics Commission for investigation. Id. ¶¶ 93-95.

In late April, 2019, Colonel McGinn, via counsel, sent Attorney Tori Kim, General Counsel for the EEA, a second notice of his Massachusetts Whistleblower claim pursuant to M.G.L.C. 149 sec. 185, and stated the Plaintiff's intention to file suit against the Defendants for retaliation. Id. ¶97.

On April 29, 2019, Secretary Beaton resigned from his position as Secretary of the Defendant Agency. Id. ¶98.

Shortly after the Plaintiff sent the second Whistleblower letter and informed the Defendants of his intention to sue, the State Ethics Commission, on May 16, 2019, notified the Plaintiff that they had voted to investigate the allegations of the 2015 civil citations issued to his neighbor. Id. ¶100.

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Fed. Rule Civ. Proc. 12(b)(6) should be rejected if a complaint establishes a "plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007); *see also Aguilera v. Negron*, 509 F.3d 50, 53 (1st Cir. 2007). In considering such a motion, a court should look to the "facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be

taken." *Dickey v. Kennedy*, 583 F.Supp.2d 183, 186 (D. Mass. 2008) (citing *Nollet v. Justices of the Trial Court of Mass.*, 83 F.Supp.2d 204, 208 (D. Mass. 2000)). For these purposes, a court should accept as true "all well-pleaded factual averments and indulge all reasonable inferences in the plaintiff's favor." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996). This standard of review is to be applied to each claim for which relief is sought in the complaint and to which a defendant directs a motion to dismiss. *See generally Bell Atl. Corp.*, 550. U.S. 544; *Rogan v. Menino*, 175 F.3d 75, 77-78 (1st Cir. 1999). When the facts alleged in the complaint are sufficient to state a cause of action, a motion to dismiss must be denied. *Dickey*, 583 F.Supp.2d at 186.

## Argument

## I. THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS AS PLAINTIFF HAS SUFFICIENTLY STATED CLAIMS IN COUNTS I, II, III AND IV

### A. Count I: Plaintiff's First Amendment Claim Against Defendants is a Legally Sufficient Claim and is not Barred as a Matter of Law by the Supreme Court's Decision in *Garcetti v. Ceballos*

Defendants have moved to dismiss Plaintiff's First Amendment claim arguing that the alleged activities and statements of the Plaintiff upon which retaliation was predicated were simply "complaints and disagreements…about management practices" and he is thus not entitled to First Amendment Protection. In support of his argument, Defendant relies upon the US Supreme Court's decision in *Garcetti v. Ceballos* that "when public employees make statements *pursuant to their official duties,* the employees are not speaking as citizens" for purposes of First Amendment protection against employer discipline. 547 U.S. 410, 421 (2006) (emphasis added).

The most recent Supreme Court decision regarding the free speech rights of public employees, *Lane v. Franks*, re-affirmed that "citizens do not surrender their First Amendment rights by accepting public employment." 134 S. Ct. 2369, 2374 (2014) (citing *Pickering v. Bd. of*

*Ed.*, 391 U.S. 563, 568 (1968)). Indeed, "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment." Id. at 2377 (quoting *Roth v. United States,* 354 U.S. 476, 484 (1957)). Contrary to Defendants' contention, "[t]his remains true when speech concerns information related to or learned through public employment." *Id*. (emphasis supplied); *see also Pomponio v. Town of Ashland*, No. 15-cv-10253-IT, 2016 WL 471285, at *4–5 (D. Mass. Feb. 5, 2016) (Talwani, J.) (same) (denying motion for judgment on the pleadings as to First Amendment retaliation claim because plaintiff police officer was spoke as a citizen on a matter of public concern).

In evaluating when a public employee's speech is unprotected, courts must therefore "balance . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [public] employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Given the critical importance of protecting speech, the Supreme Court has indicated that courts should "encourage[e], rather than inhibit[], speech by public employees." *Lane*, 134 S. Ct. at 2377 (emphasis supplied). Public employees are "often in the best position" to know the risks to the public, such that "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id*. (quoting *City of San Diego. v. Roe*, 543 U.S. 77, 82 (2004)); *Waters v. Churchill*, 511 U.S. 661, 674 (1994) ("government employees are often in the best position to know what ails the agencies for which they work.").

To undertake that careful balancing, the First Circuit has articulated the three-part inquiry necessary to determine whether an adverse employment action against a public employee violates his or her First Amendment rights: (1) whether the employee spoke as a citizen on a matter of public concern, (2) whether his or her interest in commenting on these matters

outweighed the defendant's interest in the efficient performance of its public service, and (3) whether the protected expression was a substantial or motivating factor in the adverse employment action. *Pomponio*, No. 15-cv-10253-IT, 2016 WL 471285, at *4–5 (citing *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)). As to first inquiry, *Garcetti* provides the relevant standard: "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421.

1. McGinn's Speech was not made pursuant to his employment; McGinn spoke as a citizen.

Applying the *Garcetti* standard to assess when an employee has spoken "pursuant to their official duties," however, is far from straightforward. *Id.* As the First Circuit put it, "[n]avigating the shoals of the standard articulated by the Supreme Court in *Garcetti* . . . has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific." *Decotiis*, 635 F.3d at 22. *Garcetti*, which Defendants make the centerpiece of their Motion, did not even seek to create a comprehensive framework to apply that standard. *Id.* at 421. Indeed, it arguably presented the easiest case imaginable for determining that a public employee was acting "pursuant to his professional duties" and not as a public citizen. There, the Court noted "the parties do not dispute that [plaintiff] wrote [the at-issue] disposition memo pursuant to his employment duties." *Garcetti*, 547 U.S. at 424. It is obvious why there was no dispute; the speech in *Garcetti* was that of "a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," and thus within the heartland of the prosecutor's ordinary, day-to-day work. *Id.* at 421.

Even while recognizing that there was no dispute that the plaintiff acted pursuant to professional duties, the Supreme Court took pains to explain that courts should hesitate to restrict

free speech rights: "a citizen who works for the government is nonetheless a citizen." *Id*. at 419. Therefore, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary." *Id*.

In this case, Plaintiff's speech consisted of comments he made relative to what he perceived to be unlawful misconduct on the part of the EEA Human Resource Department, supervisory officers of the Department, and other members of the Department generally. The nature of these reports was that typical of the concerns that any reasonable citizen would also have in the circumstances and, therefore, is not speech that is considered part of Plaintiff's employment. First, Plaintiff raised the issue of potential fraud because of an environmental police officer had been on paid leave for over two years without follow-up from the Agency's Human Resource Department. Defendant's Legal Department responded by admitting their failure in following the proper procedure and conceding that the officer should have been retired on a medical disability rather than maintained on the injured on duty payroll, but "they didn't know the process. . . ." Compl. ¶49.

Plaintiff's second complaint was also raised to the EEA Legal Department, particularly to Labor Attorney Thomas Costello. Plaintiff raised the issue of the lack of accountability for members of the Department. Specifically, Plaintiff reported a MEP supervisor who was neglecting his assignment to the metropolitan area and his respective duties. This incident raised another potential situation of fraud whereby the MEP supervisor likely benefited from his skirting of his responsibilities, as well as a matter of public safety. The widespread nature of the accountability issue raises concerns that are not limited to the plaintiff in his professional capacity, but can reasonably be raised by anyone. As such, the speech in question is protected speech because it was not made pursuant to his employment.

Furthermore, Plaintiff's protected speech was not made to his supervisors or up the chain of command, nor was the speech commissioned by his employer. Reporting misconduct to a legal department, especially when the misconduct is of the same nature as Plaintiff's speech, is not speech within the chain of command because the legal department is made accessible to anyone for exactly that purpose.  By its very nature the Legal Department serves a dual function as supervising authority, but also a public body whom anyone can report related issues to. Given Plaintiff's complaints were matters of public concern, for the purpose of his complaints Colonel McGinn was speaking as a citizen to the Legal Department as if it was not within the chain of command.

These factors have also been deemed appropriate indicators or speech that falls within the parameters of protected speech by a public employee.  See *Decotiis*, 635 F.3d at 32. Notwithstanding Defendant's assertions to the contrary, *Garcetti* does not stand for the proposition that all statements made by public employees in their capacity as public employees are devoid of First Amendment protection.  To the contrary, the *Garcetti* Court made clear that many statements made by public employees in their official capacities remain First Amendment protected. 547 U.S. at 419-20.

2.  A "Garden-Variety" Duty is Insufficient to Strip a Public Employee of Free Speech Rights

Although many public employees, and particularly police officers, may be subject to "garden-variety rule[s]," including to report illegal activity or to tell the truth, such rules do not trump First Amendment rights as to matters of public concern. *Taylor v. Town of Freetown*, 479 F. Supp.2d 227, 237 (D. Mass. 2007) (Saris, J.); *Jackler v. Byrne*, 658 F.3d 225, 240–41 (2nd Cir. 2011). That is particularly so where an employee's speech is outside the heartland of his or her typical responsibilities. *Taylor*, 479 F. Supp.2d at 237.

In *Taylor*, Chief Judge Saris rejected the view that *Garcetti* deprives public employees of their free speech rights whenever there is a professional obligation to make the at-issue speech. 479 F. Supp.2d at 237. In that case, the plaintiff-police officer reported corruption within the police department. *Id*. It was undisputed that the plaintiff was under a "general obligation" to "report [such] violations of departmental rules and policies and all other laws to their superior officers." *Id*. Judge Saris explained, however, that "*Garcetti* is not meant to strip an employee of First Amendment protection when speaking out regarding issues of serious and widespread public concern, like corruption, just because a garden-variety rule requires him to tell a supervisor." *Id*. (emphasis supplied); *see Camacho-Morales v. Caldero*, 68 F. Supp. 3d 261, 289 (D.P.R. 2014) ("It cannot be that all speech that would not exist but for the fact of its speaker's employment is unprotected by the First Amendment. Such a standard would make it impossible for a plaintiff to prevail on a retaliation claim when his speech even remotely concerns his job.") (emphasis in original).

Similarly, in *Jackler* the Second Circuit confirmed that a professional rule does not override a public employee's First Amendment protections of speech on matters of public concern. 658 F.3d at 240–41. There, the plaintiff-probationary police officer had a clear obligation to make the sole at-issue speech, a truthful incident report. *Id*. The court nevertheless reversed the dismissal of the plaintiff's First Amendment retaliation claims, because the incident report concerned a matter of public concern—police misconduct. *Id*. In that case, the plaintiff observed another officer mistreating a criminal suspect and, in compliance with internal policy and regulations, following a citizen complaint about that incident filed his own truthful report. *Id*. at 231–32. He then refused to comply with his superior officers' orders to retract the report. *Id*. The plaintiff never raised this issue without anyone outside his chain of command. *Id*. In

retaliation for the plaintiff's refusal to retract his truthful report, the defendants recommended that plaintiff be terminated, on the basis of which the police department did terminate the plaintiff. *Id.*

The Second Circuit was clear that the plaintiff had "an obligation to speak truthfully," including as a matter of New York state law applicable to police officers. *Id.* at 239. Consistent with that obligation, the defendants argued that plaintiff's refusals to retract his report "were part of his job" and therefore *Garcetti* required dismissal. *Id.* at 241. The obligation to be truthful, however, did not deprive the plaintiff of his free speech rights: "We think it clear that his refusals to change his statement as to what he witnessed when [defendant officer] struck [a suspect] were directed at a matter of public concern, rather than an effort to further some private interest of [plaintiff] personally." *Id.* at 240. The court found it particularly relevant that the plaintiff had disobeyed an order, which in itself "constituted speech activity that was significant different from the mere filing of his initial Report," even absent any allegation that he went outside the chain of command. *Id.*

In making his statements, Plaintiff was speaking out as a citizen with the right to voice his concerns regarding the questionable and potentially illegal behavior of state employees. Thus, *Garcetti* has absolutely no application to the case at hand and in no way bars Plaintiff's First Amendment Claim as a matter of law.

3.  McGinn's Speech Addressed Matters of Public Concern

It is critical to note that speech about official malfeasance or abuse of office by public officials is a matter of intense public interest and is, thus, speech which is of inherent public interest. *See O'Connor v. Steeves*, 994 F.2d 905, 913-915 (1st Cir. 1993); *see also Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of

corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import").

Moreover, speech concerning the abuse of power by senior public officials is given strong First Amendment protection. See *O'Connor*, 994 F.2d at 916 ("The strong *public* interest in [the disclosure of unauthorized purchasing practices by a town official] supplements O'Connor's relatively slight *personal* interest in speaking out, heavily weighting the *Pickering* scale in favor of First Amendment protection against retaliation for O'Connor's speech" [emphasis original]); *See Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 224 (D. Mass. 2002) (police officer's statements regarding corruption and racism held matters of "public concern").

The Defendant cites, and misapplies, the Court's ruling in *Jordan v. Carter*. 428 F.3d 67 (1st Cir. 2005). At the motion to dismiss stage, the Court in *Carter* stated:

> "Drawing all inferences in favor of the plaintiffs, we cannot reject the possibility that at least some of the speech would fall within an area of public concern. Indeed, appellant admits as much. Criticism of the chief and other management, as well as expressions of concern about safety at one of the MBTA passenger stations, could—depending upon the particulars of content, form and context—constitute "a matter of legitimate public concern," *O'Connor,* 994 F.2d at 915. Certainly, if either official misconduct or neglect of duties was asserted to be responsible for unsafe conditions for the general public, this would be a matter of public importance. If, however, the performance critiques concerned only matters of internal working conditions, and the discussion of "safety issues" at the Dudley Station likewise reflected an employee workplace concern rather than the public interest, plaintiffs' constitutional claim would falter at the threshold inquiry. With the record undeveloped, and the facts thus still capable of tilting in either direction, we accept for present purposes that the public concern prong is satisfied." *Jordan*, 428 F.3d, at 73.

As clearly stated in Plaintiff's Complaint, McGinn has alleged that he was reporting more than managerial disputes, he was reporting criminal activity of MEP officers who were being paid for work they were not performing. During the time period of Plaintiff's complaints including the ten months prior, the Boson media had focused on issues surrounding overtime

abuse by members of law enforcement, particularly E-Troop of the Massachusetts State Police. Many of these officers were *criminally* charged for the same conduct that Plaintiff was reporting. Thus, Plaintiff was not merely holding MEP officers "accountable" through his protected speech, he was reporting what is reasonable to believe is criminal activity.

Additionally, the safety issues that flow from the activity Plaintiff reported were not safety issues concerning only the employee workplace, but were meaningful and relevant for public safety at large. Plaintiff was reporting police officers' failure to show up for their jobs which inherently creates unsafe conditions for the general public. The substance of Colonel McGinn's speech in concert with the implications for the community clearly sums to protected speech.

**B. The Plaintiff Has Established a Question of Material Fact as to Whether Defendants Violated the Massachusetts Whistleblower Act**

The Massachusetts Whistleblower Act (the "Act") prohibits a public employer from taking any retaliatory action against an employee because the employee, *inter alia*, discloses, objects to and/or refuses to participate in an activity, policy or practice which the employee reasonably believes violates a law and/or a rule or regulation promulgated by law. M.G.L.c.149, §185(b). *Haddad v. Scanlon*, No. 99-180, 1999 Mass. Super. LEXIS 272 (July 16, 1999). "Retaliatory action" is defined as the discharge, suspension or demotion of an employee or other adverse employment action taken against an employee in the terms and conditions of employment. M.G.L.c.149, §185(a)(5).

Defendants' concede in their own memorandum, either intentionally or unintentionally, that at least some of the complaints raised by McGinn concerned illegal activities and not merely disagreements over management practices. Defendants titled the subsection of its whistleblower argument, "McGinn's Allegations Largely Concern Disagreements over Management Practices,

Not Illegal Activities." (emphasis added). This concession alone – stating that at least some of McGinn's complaints were regarding illegal activities – should be enough for Plaintiff's WPA claim to survive in light of the undisputed fact that McGinn was subsequently terminated.

1. The Plaintiff Disclosed and/or Objected to Activities He Reasonably Believed Were in Violation of the Law.

The Whistleblower Act, M.G.L. c. 149, §185, subsections b(1) and b(3), does not require that the employee actually prove that a violation of law had occurred, but protects the employee if he or she "reasonably believes" that the act disclosed was in violation of law. Preliminarily, Massachusetts' appellate courts have expressed extreme reluctance to allow a summary judgment, let alone a motion to dismiss, which turns on the application of the "reasonable man" standard.

This "reasonableness standard" in the context of the MWA is demonstrated in *Sullivan v. Mass. Mut. Life Ins. Co*. 802 F. Supp. 716, 726 (D. Conn. 1992). In *Sullivan*, the Court denied a motion for summary judgment of a Massachusetts Whistleblower Act claim on the 'reasonable belief' issue, writing: "The focus on the reasonableness of a whistleblower's beliefs requires courts to decide extremely fact-intensive disputes rife with credibility and state-of-mind issues that are frequently not amenable to summary judgment and thus inevitably require a trial." *Id*.

Plaintiff has offered clear evidence of the reasonableness of his concerns regarding the conduct of the EEA and members of the Environmental Police. First, with respect to the officer who was on paid leave, Colonel McGinn had experience with officers in similar situations by virtue of his previous employment with the Massachusetts State Police. With this experience, Plaintiff expressed valid concerns about the "inordinately long period of time" that the officer was on paid leave without follow-up or an explanation from the HR Department who had failed

to conduct an independent medical examination. Subsequently, the Defendants' Legal Department actually confirmed that they too were handling the situation incorrectly by admitting they did not know the proper procedure for processing the officer's situation. This response by the Legal Department only serves to prove that Plaintiff's concerns were, in fact, reasonable.

Secondly, as mentioned *supra*, at the time of Plaintiff's complaints about Department members' accountability and failure to report for work, there was a tremendous amount of media attention focused on the issue of overtime abuse by members of law enforcement. This abuse was the exact conduct that Plaintiff was reporting, but rather than overtime bonuses being at issue, the members of the EEA were receiving pay and benefits without doing their job at all. Plaintiff raised this issue of accountability directly to his supervisor, Defendant Beaton, with respect to senior members of the MEP, and he also raised the issue to an EEA Labor Attorney where a particular officer's conduct was in question. The lack of accountability was so significant that Plaintiff sent a Department wide email about the issue. Since individuals related to the overtime abuse situation were being criminally charged and the two situations were analogous – even arguably more egregious in the situation Plaintiff was reporting –, Plaintiff reasonably believed that the misconduct he was objecting to was also illegal.

Finally, Plaintiff was approached multiple times throughout the years leading up to his termination to unlawfully use his position as Colonel to benefit his colleagues. On the first occasion he was asked by his supervisor to utilize police resources for an unlawful background search of Defendant Beaton's neighbor. Without a legitimate law enforcement purpose, doing so would be illegal; Plaintiff knew this, so he rightfully refused. On two separate occasions, Plaintiff was approached by members of the Department, including Defendant Beaton, to "assist with" traffic tickets. Knowing that he had no authority to void tickets and that doing so would be

to take advantage of the confidence imparted on him in his role, Plaintiff refused. This pattern caused Plaintiff to reasonably believe that there were unlawful practices occurring in the Department. The fact that he was terminated for allegedly voiding tickets three years earlier – despite his denial and Major Billotta's confirmation that *he* did so, *not* the Plaintiff – confirms the reasonableness of Colonel McGinn's belief that there was unlawful conduct permeating the MEP.

2. Plaintiff has Complied with the Requirements of the Massachusetts Whistleblower Protection Act

In the Defendants' motion, they first present the argument that Plaintiff did not comply with the written notice requirement of Mass. Gen. Laws c.149, § 185 (Whistleblower Protection Act, "WPA"). Their argument fails in multiple respects.

Only when an employee claims to be protected based on a disclosure made to a public body, pursuant to section 185(b)(1), must the employee bring the issue to the attention of a supervisor by written notice. G.L. c. 149, § 185(c)(1).[2] By its plain language, the written notice requirement is applicable only when the employee alleges that he or she is protected for conduct described in section 185(b)(1), as it relates to a complaint to a public body. Though section 185(b)(1) protects disclosures of information "to a supervisor *or* a public body" (emphasis added), section 185(c)(1) only requires written disclosure to the extent that disclosure is made to

---

[2] The relevant provision states:

(c)(1) Except as provided in paragraph (2), the protection against retaliatory action provided by subsection (b) (1) shall not apply to an employee who makes a disclosure to *a public body* unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment, to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice. G.L. c. 149, § 185(c)(1) (emphasis added).

a "public body." Thus, a disclosure to a supervisor, pursuant to section 185(b)(1) is not subject to a written notice requirement. Furthermore, the written notice requirement is not applicable to those protected under section 185(b)(3). *Mailloux v. Littleton,* 473 F. Supp. 2d 177, 185 (D. Mass. 2007). The written notice requirement, then, is only applicable in limited circumstances of which the present case is not one.

The Defendants claim that the Plaintiffs "has failed to allege that he delivered the required written notice to his supervisor (Beaton) about his complaints." However, the First Circuit has rejected the view that written notice would be required in such circumstances. *See Dirrane v. Brookline Police Department,* 315 F.3d 65, 72-73 (1st Cir. 2002). "It is apparent that an *oral* disclosure to a supervisor is protected outright against retaliation; the requirement of written notice and an opportunity to correct is imposed where the disclosure is to an *outside* public body....In short, to treat [Plaintiff's] internal complaints as triggering the notice requirement makes no sense." *Id.* (emphasis in original).

Written notice is not required with regard to the retaliation against Plaintiff for objecting to, and refusing to participate and acquiesce in illegal conduct that was rampant throughout the MEP, including, but not limited to, the use of Department resources for unlawful background searches, *see* Compl. ¶12-14, the voiding of traffic tickets, *see e.g.,* Compl. ¶29-31, 34-37, failure to present for work, *see e.g.,* Compl. ¶¶17, 55, and the allocation of grant funds for an unrelated purpose without compensation. *See* Compl. ¶¶38-42. The Plaintiff was ostracized and ultimately terminated for not going along with the wrongful conduct. Since Plaintiff was terminated for opposing what he reasonably believed to be illegal conduct, his conduct is protected by G.L. c. 149, § 185(b)(3). That provision makes it illegal to retaliate against a public employee for objecting to, or refusing to participate in an activity, policy or practice which the

employee reasonably believes is in violation of the law. G.L. c. 149, § 185(b)(3). Section 185(b)(3) claims are not subject to the written notice requirement. *Mailloux,* 473 F. Supp. 2d at 185.

Additionally, even assuming *arguendo* that written notice was required, Plaintiff complied with the requirement by submitting multiple whistleblower letters on January 2, 2019 and in late April 2019. Defendants incorrectly contend that this written notice is insufficient because Defendant Beaton was no longer Plaintiff's supervisor as it was issued after Colonel McGinn's termination. However, this logic is flawed. Firstly, the notice was provided to Defendant Beaton when he was still in his supervisory role as Secretary of the Defendant Agency EEA. Even though Defendant Beaton was no longer Plaintiff's direct supervisor, he was still in a supervisory position and considered a high-ranking representative of the employer. Secondly, the timing of the notice at issue here is not problematic. In fact, the First Circuit recognizes that the notice provision in the Whistleblower Statute is to ensure that notice is provided only before filing suit. *See Wagner v. Holyoke*, 241 F.Supp.2d 78, 98 (D. Mass. 2003) (interpreting the holding of *Dirrane*, 315 F.3d 65), *affirmed* 404 F.3d 504 (1st Cir. 2005). Requiring notice before any retaliation is counterintuitive to the purposes of the statute. *Cf. id.* Therefore, Plaintiff has provided written notice sufficient to satisfy the requirement.

Lastly, it would frustrate the purpose of the WPA if a supervisor were able to elude liability under the act by terminating an individual in retaliation for reporting criminal activity and then claim that there was no recourse because they were no longer their supervisor.

In sum, the Plaintiffs Whistleblower claim should not be dismissed for the multitude of reasons set forth above.

**C. Plaintiff has Stated a Claim Upon Which Relief May be Granted Under the Massachusetts Civil Rights Act.**

To establish a claim under the MCRA, a Plaintiff must prove that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Currier v. Nat'l Bd. of Med. Exam'rs*, 965 N.E.2d 829, 837-38 (Mass. 2012) (citing *Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 408 (Mass. 2003)).

Although the Defendant argues that Plaintiff has failed to establish an actual deprivation of his constitutional rights, the Plaintiff has clearly alleged a violation of his right to free speech. Specifically, Plaintiff alleges that his constitutional rights were interfered with when he suffered retaliatory treatment after speaking out on concerns regarding possible misconduct by state officials. In *Flesner v. Tech. Commc'ns Corp.*, the Supreme Judicial Court ruled that whistle blowing is protected speech. 410 Mass. 805, 810 (1991). As such, it becomes evident that the plaintiff's claim is viable because he is seeking redress for constitutional harm. *See Cignetti v. Healy,* 967 F.Supp. 10 (D.Mass. 1997) (Lasker, J.) (holding that a firefighter's allegation that city officials retaliated against him for making public statements regarding the city's waste policies sufficed to support claims under the First Amendment and the Massachusetts Civil Rights Act).

Defendants further allege that Plaintiff has failed to identify conduct that establishes the requisite "threats, intimidation or coercion" necessary to state an MCRA claim. Massachusetts courts have defined the statutory term "threats, intimidation or coercion" in the following manner: A "'threat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting [another] in fear for the purpose of compelling or deterring conduct. . . . [Coercion involves] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not

otherwise have done.' " *Reprod. Rights Network v. President of Univ. of Mass.,* 45 Mass. App. Ct. 495, 505 (1998).

The facts contained in Plaintiff's Complaint demonstrate that removing Plaintiff from his position as a police officer for the MEP was intended to and had the effect of interfering with Colonel McGinn's right to continued employment, due process, and free speech through economic coercion and threat of criminal prosecution. Defendants tried to coerce Plaintiff to resign and stop making valid complaints by threatening him with criminal prosecution and an unwarranted investigation of a matter that occurred three years prior. Defendant Beaton encouraged Plaintiff to "quietly resign," to avoid the investigation. Compl. ¶84. Plaintiff refused to do so, and the investigation continued despite the Attorney General's office taking no action. The Defendant's investigation was inadequate and was used as a means of coercion; this deprived Colonel McGinn of his due process rights. Later the "investigation findings" became the pretextual reason for Plaintiff's termination. In fact, the timing of Defendants' investigation of Plaintiff overlaps with the media's critique of the Massachusetts State Police's handling of overtime abuse issues analogous to Plaintiff major concerns, strongly suggesting that the purpose of pursuing the investigation was to ensure Colonel McGinn would stop raising the issue either willingly or by the force of termination.

Coercion is evident in the case at hand and has ultimately had the effect of interfering with Colonel McGinn's practice and enjoyment of his constitutionally protected rights of continued employment, due process, and free speech. Therefore, Plaintiff has stated a claim under the Massachusetts Civil Rights Act.

### D. Plaintiff has Sufficiently Stated a Claim of Wrongful Termination in Violation of Public Policy and an MCRA claim against Defendant Beaton

Defendants claim that as public entities they are immune from intentional torts, including the Wrongful Termination in Violation of Public Policy at issue here, as well as an MCRA claim brought against them in their official capacities. To clarify, though, the claims are also brought against Defendant Beaton in his *individual* capacity; therefore, the Defendants' argument is entirely inapplicable to Defendant Beaton.

### E. It is Premature to Force Plaintiff to Elect Between Counts; the Whistleblower Act Reserves Plaintiff's Rights to Assert Additional Claims and Plaintiff has not Waived his Right to do so

Defendants argues that the well pled whistleblower claim bars recovery pursuant to the theories asserted in Plaintiff's claim for termination in violation of Public Policy (Count IV). This assertion may or may not be accurate. At this stage of the litigation, it doesn't matter. Plaintiff asserts that, even if Defendant is technically correct, the unique facts of this case combined with the uncertain status of the law render a forced election at this stage unjust and unfair.

It is axiomatic that Plaintiff may plead in the alternative. *See e.g., Zak Law Offices, P.C. v. Reed,* No. 10-10333-LTS, 2010 WL 2802068 (D. Mass. 2010) (It is permissible to plead "Quantum Meruit" and "Breach of Contract" in the same complaint even though the remedies are mutually exclusive); *see also Lipsitt v Plaud,* 466 Mass. 240 (2013)(Overturning allowance of defendant's 12(b)(6) based upon argument that the Wage Act creates a comprehensive statutory remedy for the recovery of unpaid wages, thereby precluding plaintiff's common-law claims for breach of contract, quantum meruit, and fraud and deceit.) Mass. R. Civ. P. 8. Thus, whether one count precludes recovery for another should await the verdict.

Defendant cites no case whatsoever requiring dismissal of non-whistleblower counts in a multi-count complaint and fails to recognize that "[m]odern rules of pleading permit alternative

pleading." *Matter of Hilson,* 448 Mass. 603, 613 (2007). *See* Mass. R. Civ. P. 8 (e) (2); *Op. of the Justices*, 365 Mass. 749 (1974). The defendants are quick to quote a short section of the statute which suggests one who institutes a whistleblower action "waives any rights and remedies available for the actions of the employer under other sections of the law..." M.G.L. c. 149 sec. 185(f). Elsewhere however, the statute states: "nothing in this section shall be deemed to diminish the rights privileges or remedies of any employee under any other state or federal law or regulation or under any collective bargaining agreement or employment contract." M.G.L c. 149 sec. 185(f).

This clause together with the legislative history of the Whistleblower statute suggest that the statute was primarily intended to enhance remedies available to employees. The Whistleblower statute was obviously designed to broaden protection to vulnerable workers, not to force them to jettison legitimate independent claims as a condition to invoking the statute. *Bennett*, 230 F.Supp.2d, at 220-21.

### F. The MEP is a Proper Defendant in this Suit.

Defendants assert that the MEP is not a proper defendant because it is a subdivision of the EEA. However, while many of the decisions made by the director of law enforcement of the MEP are required to be approved by the secretary of the EEA, the director of law enforcement is authorized to act independently with respect to the duties of the law enforcement officers. *See* M.G.L. c. 21A § 10A ("The director may promulgate rules and regulations necessary for implementation of sections 10A to 10H, inclusive . . ."). Given that the MEP has some level of independence, it is possible that the larger EEA sought to establish separate entities subject to suit through its subdivisions. *Cf. Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995). Additionally,

MEP may be subject to suit under Plaintiff's §1983 claim because the MEP was created pursuant to state legislation, showing that it was intended to be a formal independent entity. *See id.*

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion to dismiss.

Respectfully submitted,
For Plaintiff James McGinn,
By his attorney,

*/s/ Timothy M. Burke*
Timothy M. Burke, BBO #065720
160 Gould Street, Suite 100
Needham, MA 02494-2300
attytmb@aol.com

## LOCAL RULE 7.1(A)(2) CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I have conferred with counsel for all parties in this matter in a good faith attempt to resolve or narrow the issues; and that counsel for all parties have assented to or joined in this motion.

Dated: November 1, 2019             */s/ Timothy M. Burke*
                                    Timothy M. Burke

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent this day to those participants indicated as non-registered participants.

Dated: November 1, 2019             */s/ Timothy M. Burke*
                                    Timothy M. Burke